**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF Y&S MARINE, INC., AS OWNER AND OPERATOR OF M/V SUN FIGHTER, PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION<br><br>No. 10-2094<br><br>Section "E" |

**ORDER AND REASONS**

Before the Court are cross-motions for summary judgment filed by petitioner in limitation Y&S Marine, Inc. ("Y&S") and claimant Harvest Group, LLC ("Harvest) on Y&S's counterclaim, which asks that Harvest be ordered to indemnify and hold Y&S harmless for any damage to Harvest's property.[1] For the following reasons, Y&S's motion is **GRANTED** and Harvest's motion is **DENIED**.

**BACKGROUND**

Harvest, an energy services company that does work offshore, entered into a Master Services Agreement ("MSA") in 2006 with Y&S, a maritime services company, to provide transportation of groceries, water, and people to Harvest's oil wells off the Louisiana coast.[2] Their relationship proceeded smoothly until January 24, 2010, when Y&S's vessel the M/V SUN FIGHTER, captained by its employee Phat Chu, allided with one of Harvest's offshore well jackets while transporting water and a third-party contractor to one of Harvest's

---

[1] R. Docs. Nos. 58, 63. In addition to the parties' mutual oppositions, Certain Primary Protection and Indemnity Underwriters Subscribing Severall to Policy No. UMR: B0702PA016380Y (the "P&I Underwriters") have filed an opposition to Harvest's motion. R. Doc. No. 78.

[2] R. Doc. No. 58-4, p. 1; R. Doc. No. 63-5, p. 23.

1

platforms.[3] Mr. Chu was unlicensed at the time of the accident, and the Coast Guard cited him for violating 46 C.R.F. § 15.401, which prohibits operation of a vessel outside the restrictions of a license, and 33 U.S.C. § 2005, which requires maintenance of a proper lookout.[4] The accident caused significant damage.

Y&S commenced this action under 46 U.S.C. § 30501 *et seq.* to limit its liability.[5] Harvest answered the limitation complaint and filed a claim for damages to its well, after which Y&S filed the counterclaim at issue, asserting that the MSA requires Harvest to indemnify Y&S and hold it harmless for any damage to Harvest's property.[6] Article 10.0 of the MSA contains several indemnity provisions. Its first paragraph provides:

> To the extent permitted by law, [Harvest] agrees to defend, indemnify and hold [Y&S], its subsidiaries, affiliated companies, subcontractors, agents, invitees, and all of their respective officers, directors and employees (the "[Y&S] Group") harmless from and against any and all claims or causes of action: A) for loss of or damage to the respective property and equipment of [Harvest] Group and B) from and against any and all claims or causes of action for injury to or death of any member of [Harvest] Group, regardless of the cause or reason thereof, and regardless of the sole joint or concurrent negligence of the [Y&S] Group.[7]

The second paragraph provides:

> To the extent permitted by law, [Y&S] agrees to defend, indemnify and hold [Harvest], its subsidiaries, affiliated companies, co-venturers and co-lessees, subcontractors, agents, invitees, and all of their respective officers, directors and employees (the "[Harvest] Group") harmless from and against any and

---

[3] R. Doc. No. 58-1, p. 1; R. Doc. No. 63-3, p. 2. There is no dispute that Y&S was performing work under the MSA at the time of the allision.

[4] R. Doc. No. 58-1, p. 2; R. Doc. No. 58-6, p. 139; R. Doc. No. 58-7, p. 1.

[5] R. Doc. No. 1.

[6] R. Docs. Nos. 13, 32.

[7] R. Doc. No. 58-4, p. 7.

2

all claims or causes of action: A) for the loss of or damage to the respective property and equipment of the [Y&S] Group and B) from and against any and all claims or causes of action for injury to or death of any member of [Y&S Group], regardless of the sole joint or concurrent negligence of the [Harvest] Group.[8]

The third paragraph provides:

Each party shall indemnify and defend the other against (I) fines or civil penalties and (II) costs (including legal fees and expenses) and liability arising from claims or suits by third parties based on death, personal injury, loss or damage to property or to the environment to the extent (I) or (II) are caused by its negligence, as used herein, a "third party" shall mean any firm, person or other entity not a member of the [Harvest] Group or the [Y&S] Group.[9]

Y&S asserts that these "knock-for-knock indemnification and hold-harmless provisions in the MSA between Harvest and Y&S broadly require Harvest to defend, indemnity and hold Y&S harmless for damage to Harvest's property, including its well jacket."[10] Thus, "[b]ecause Harvest contractually waived its right to bring a claim for damage to its property when it entered into the MSA," Y&S asks the Court for summary judgment, dismissing Harvest's and its insurer St Paul's claims with prejudice."[11]

Harvest claims that it is entitled to summary judgment on Y&S counterclaim—meaning that Harvest is not required to indemnify or hold Y&S harmless for the damage to Harvest's property—because "(1) nothing in the 'Indemnification' provision in the MSA exonerates or releases Y&S for its direct liability to Harvest; (2) interpreting the terms and phrases of the 'Indemnification' provision to exonerate or release Y&S would

---

[8] R. Doc. No. 58-4, pp. 7–8.

[9] R. Doc. No. 58-4, p. 8.

[10] R. Doc. No. 63-1, p. 1.

[11] R. Doc. no. 63-1, pp. 1–2.

3

contradict other provisions of the MSA wherein Y&S agreed to be liable for its failure to perform its services in a good and workmanlike manner and in compliance with all applicable laws, rules, and regulations; and (3) Y&S failed to plead 'release' in its Answer and thus waived it as an affirmative defense."[12]

## STANDARD OF LAW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Id.* at 322-23. Once the burden has shifted, the non-moving party must direct the Court's attention to something in the pleadings or other evidence in the record that sets forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist. *Id.* at 324.

If the dispositive issue is one on which the non-moving party will bear the burden

---

[12] R. Doc. No. 58-2, p. 2.

of proof at trial, however, the moving party may satisfy its burden by simply pointing out that the evidence in the record is insufficient with respect to an essential element of the non-moving party's claim. *See Celotex*, 477 U.S. at 325. The nonmoving party must then respond, either by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party" or by coming forward with additional evidence. *Celotex*, 477 U.S. at 332-33 & 333 n.3.

"An issue is material if its resolution could affect the outcome of the action." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150-51 (2000). All reasonable inferences are drawn in favor of the non-moving party. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

## ANALYSIS

### I. Choice of Law

The parties dispute the applicable law.[13] Harvest asserts that Louisiana law applies,

---

[13] Although the parties dispute which law applies, both assert that it does not matter which law applies. The Court must nevertheless resolve the issue to determine the body of law to use in interpreting the MSA.

while Y&S asserts that the General Maritime Law applies.[14] But both agree that the text of the choice-of-law clause in the MSA is determinative. It provides:

> Except as expressly provided in this Contract, this Contract shall be governed by and construed in accordance with the laws of the State of Louisiana, without regard to the conflicts of law principles that might apply the law of another jurisdiction. For Work performed offshore, the provisions of this Contract shall be construed in accordance with the General Maritime Law of the United States or, if permissible, with the laws of the state applicable to the Work.[15]

Harvest points to the sentence at the beginning of this clause, which states that the MSA "shall be governed by and construed in accordance with the laws of the State of Louisiana." Y&S argues that under the second sentence, the General Maritime Law applies because the relevant "Work" was performed "offshore." Y&S is correct.

The work at issue—piloting a boat to deliver people and sundries to Harvest's well offshore—is "Work performed offshore." "It is a fundamental axiom of contract interpretation that specific provisions control general provisions," *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002), and the second sentencing selecting the General Maritime Law is more specific (applying only to work performed offshore) than the first sentence selecting Louisiana law (which applies to the entire contract). Nor does the second clause of the second sentence—"or, if permissible, with the laws of the state applicable to the Work"—apply. "'An agreement to transport people and supplies in a vessel to and from a well site on navigable waters is clearly a maritime contract,'" so in the absence of the parties' agreement, the General Maritime Law

---

[14] R. Doc. No. 58-2, p. 5; R. Doc. No. 77, p. 2. The P&I Underwriters also assert that the General Maritime Law applies. R. Doc. No. 78, p. 3.

[15] R. Doc. No. 58-4, p. 8.

6

would have applied of its own force. *Johnson v. Seacor Marine Corp.*, 404 F.3d 871, 877 (5th Cir. 2005) (quoting *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985)). There are therefore no "laws of the state applicable to the Work" that may, "if permissible," be applied. No state's law would have been "applicable to the Work" at issue.[16]

## II. Interpretation of the MSA

A plain-language reading of Article 10.0 of the MSA supports Y&S's position that Harvest and its insurer may not bring a claim against Y&S for damage to the well jacket. Harvest's claim is "for loss of or damage to the respective property and equipment of [Harvest] Group," yet Harvest "agree[d] to defend, indemnify and hold [Y&S], its subsidiaries, affiliated companies, subcontractors, agents, invitees, and all of their respective officers, directors and employees harmless from and against any and all" such "claims or causes of action."[17]

Harvest asserts that reading is incorrect because the "'indemnity' and 'hold harmless' language included in the MSA does not release or exculpate Y&S from direct liability to Harvest."[18] Its supports this contention by noting that there are "two common allocation

---

[16] This clause has effect when "Work performed offshore" would not be governed by the General Maritime Law, for example, when work under the MSA is performed on an Outer Continental Shelf Lands' Act ("OCSLA") situs. Such work is "Work performed offshore," but state law applies under certain conditions. *ACE Am. Ins. Co. v. M-I, L.L.C.*, 699 F.3d 826, 830 (5th Cir. 2012) (citing *United Tex. Petro. Corp. v. PLT Eng'r, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990)).

[17] R. Doc. No. 58-4, p. 7.

[18] R. Doc. No. 58-2, p. 6.

7

of liability clauses," namely, "exculpatory clauses which release a person from his own negligence" and "indemnity clauses, which hold[] the indemnitee harmless from various liabilities by requiring the indemnitor to bear the cost of damages for which the indemnitee is held liable."[19] Harvest then says that, "[a]ccording to the courts, 'typical release language is "release," "discharge," or "relinquish,"' whereas typical indemnity language includes '"indemnify," "save," "protect," and "hold harmless."'"[20] Harvest's argument is, at bottom, the words "indemnify" and "hold harmless" mean, as a matter of law, that Article 10.0 "operate[s] only vis-a-vis [Y&S's] liability to a third party."[21]

Harvest's Louisiana case cites do not support this proposition. The language in the case that Harvest cites for the proposition that release clauses "deprive[] the injured party of the right to recover from the other any damages caused by the actions of the party released" while "indemnity or hold harmless agreement[s]" are those "wherein the indemnitor agrees to protect the indemnitee against the claims of third parties alien to the indemnity contract itself" comes from a dissent, and in any event, does not suggest that only certain specific words can create a situation where a party is effectively released. *Plantation Pipe Line Co. v. Kaiser Aluminum & Chem. Corp.*, 222 So.2d 905, 915 (La. App. 1969) (Landry, J., dissenting). The Louisiana Supreme Court case Harvest cites, *Home Insurance Co. of Illinois v. National Tea Co.*, holds only that a clause providing for "release and discharge" does not impose a corresponding duty to indemnify for claims by third

---

[19] R. Doc. No. 58-2, p. 6.

[20] R. Doc. No. 58-2, p. 7 (quoting *Wallerstein v. Spirt*, 8 S.W.3d 774, 780 (Tex. App. 1999)).

[21] R. Doc. No. 58-2, p. 7.

parties—in other words, the obverse of Harvest's claim that an indemnity clause cannot have the effect of a release clause. 588 So.2d 361, 363 (La. 1991).[22] Moreover, Louisiana cases have held that "hold harmless" language "must be interpreted to release" one contracting party from liability to another. *Elephant, Inc. v. Hartford Accident & Indemnity, Co.*, 239 So.2d 692, 695 (La. App. 1970).

The cases that come closest to supporting Harvest's argument are *Wallerstein v. Spirt*, 8 S.W.3d 774 (Tex. App. 1999), and *MG Builders Materials, Inc. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51 (Tex. App. 2005). In *Wallerstein*, the Texas Court of Appeals did state that "an indemnity does not apply to claims between the parties to the agreement," and that "[t]ypical indemnity language is 'indemnify, save, protect, save/hold harmless.'" 8 S.W.3d 774, 780 (Tex. App. 1999). But *Wallerstein* did not hold that the mere use of the words "indemnify" and "hold harmless" by itself converts an otherwise seemingly unambiguous provision into one limited to claims by third parties.[23] *MG*

---

[22]   In any event, the clause at issue in *Home Insurance* provided that the lessor "does hereby release and discharge the Lessee . . . from any and all claims and damages whatsoever from any cause resulting from or arising out of any fire." *Id.* Nothing in that language suggests that the lessor also assumed the obligation to defend or indemnify the lessee from claims by third parties. In contrast, the plain language in the MSA—"[Harvest] agrees to defend, indemnify and hold [Y&S] . . . harmless from and against any and all claims or causes of action: A) for loss of or damage to the respective property and equipment of [Harvest] Group"—does require Harvest to indemnify Y&S for any claims for damage to Harvest's property, "regardless of the cause or reason thereof, and regardless of the sole joint or concurrent negligence of [Y&S]." R. Doc. No. 58-4, p. 7.

[23]   For example, *Wallerstein* was also "persuaded to [reach its holding] because the partnership agreement clearly releases *limited* partners from any liability . . . but does not so release the general partner," who was the defendant and being sued by his limited partners. 8 S.W.3d at 780.

*Building Materials* comes closest to the clear rule Harvest would like, however, as it held that a provision requiring one party to "hold [the other] harmless from any loss, claim, or expense" was limited to third-party claims.[24] 179 S.W.3d at 64.

Yet Texas law does not govern this dispute, and none of the cases Harvest cites deals with a contract containing a specific third-party indemnity provision in addition to one that applies between the parties. Without a rule in the General Maritime Law that a provision using the words "indemnify" and "hold harmless" applies only to claims brought by third parties, this Court's job is to interpret the contract "according to its plain meaning," reading each contractual "provision in light of other provisions in the contract, so that each is given the meaning suggested by the contract as a whole." *Travelers Ins. Co. v. McDermott, Inc.*, 2003 WL 21999354, at *7 (E.D. La. Aug. 22, 2003).[25] Indeed, Harvest makes this very point when it asserts that Y&S's construction of the indemnity clauses is incorrect because the

---

[24] It is also worth noting that *Wallerstein* and *MG Building* are in tension with cases from the Texas Supreme Court, which does not appear to observe their "magic words" approach and instead uses words like "release" and "indemnity" interchangeably. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505 (Tex. 1993) ("These agreements, whether labeled as indemnity agreements, releases, exculpatory agreements, or waivers, all operate to transfer risk. . . . [T]hese particular agreements are used to *exculpate* a party from the consequences of its own negligence. Because *indemnification* of a party for its own negligence is an extraordinary shifting of risk, this Court has developed fair notice requirements which apply to these types of agreements." (emphases added)).

[25] The General Maritime Law cases Harvest cites either do not state the rule it advances, *In re Oil Spill by the Oil Rig "DEEPWATER HORIZON,"* 841 F. Supp. 2d 988 (E.D. La. 2012), or at most suggest it in dicta and in a factually distinguishable context, *Kevin Gros Marine, Inc. v. Quality Diesel Serv., Inc.*, 2012 WL 1946132 (E.D. La. May 30, 2012). Without a clear rule, the clear terms of the contract control.

10

MSA read as a whole, including the warranty and compliance with laws provisions, supports the conclusion that Y&S may still be liable to Harvest for damage to its property.[26]

The first purported conflict Harvest cites is with Article 7.0 (Warranty), which provides:

> Contractor warrants and represents that it shall (1) perform the Work in a good and workmanlike manner consistent with applicable industry standards and practices; (2) use sound engineering and/or technical principles where applicable; (3) perform the Work in compliance with specifications provided or approved by Company; (4) use or furnish materials and equipment that are merchantable, fit, and new; and (5) where mutually agreed, use or furnish merchantable, fit, and used material and equipment. To the extent assignable, all rights and remedies available to [Y&S] or its subcontractors shall be passed directly to [Harvest]. [Harvest] shall also have the rights and remedies provided by the Uniform Commercial Code. At no cost to [Harvest], [Y&S] shall remedy nonconforming workmanship or replace nonconforming material and equipment, including removal and replacement of facilities to (1) reveal and (2) repair or replace nonconforming Work. If [Y&S] does not remedy nonconforming Work immediately, [Harvest] may do so at [Y&S's] expense. If [Y&S] fails to pay this expense, [Harvest] may deduct all expenses from any proceeds due to [Y&S]. At no cost to [Harvest], [Y&S] shall diligent and promptly remedy nonconforming workmanship, material and equipment appearing (a) within (1) year from the date of final acceptance or (b) within such longer period of time as provided by manufacturer's warranty.[27]

Harvest suggests that "reading the 'Indemnification' provision as a release of Y&S liability" would "directly contradict the 'Warranty' provision to the extent that Y&S would be obligated to remedy its nonconforming work (which would include damage to Harvest's well from the vessel allison) under the 'Warranty' provision while Harvest would simultaneously be required to release Y&S from this obligation in the 'Indemnification'

---

[26] R. Doc. No. 58-2, p. 12.

[27] R. Doc. no. 58-4, p. 6.

provision."[28] That is not the case. Even assuming the warranty clause extends to nonconforming work in the sense of an accident, as opposed to nonconforming work in the sense of imperfect provision of a good or service, both clauses may be given effect.[29]

For example, the accident that began this case presumably prevented Y&S from delivering as agreed the personnel and water that the M/V SUN FIGHTER was carrying to Harvest's platform. Assuming that qualifies as "nonconforming workmanship" because Y&S did not provide the agreed-upon services, the warranty clause obligated Y&S to provide replacement water and alternative transportation for the personnel "immediately." If it failed to do so, the warranty clause entitled Harvest to remedy this deficiency at Y&S's expense. If Y&S failed to pay for any remedy Harvest undertook, the warranty clause allowed Harvest to deduct the expense of the remedy from any amounts owed Y&S. Thus the warranty clause may be given effect—allowing Harvest a remedy for the "nonconforming workmanship" caused by Y&S not providing the agreed-upon service—and the indemnity clause may be given effect, requiring Harvest to hold Y&S harmless for the "loss of or damage to the respective property of" Harvest.

Or as another example, consider a case where Y&S delivers spoiled groceries to one

---

[28] R. Doc. no. 58-2, p. 14.

[29] This assumption (that the warranty clause includes accidents) is far from clear. As the warranty clause is ambiguous, construing it as limited to claims for nonconforming products and not accidents would be more appropriate than construing the indemnity clause as not covering what it specifically says it covers (accidents). The parties knew how to exempt provisions of the MSA from the indemnity clause, as evidenced by their decision to exempt Article 6.4 by adding "notwithstanding anything to the contrary contained in Article 10.0, INDEMNIFICATION." They did not choose to exempt the warranty clause. R. Doc. No. 58-4, p. 5.

12

of Harvest's platforms, and one of Harvest's employees falls sick or dies after eating them. The warranty clause would allow Harvest to demand immediate replacement of any remaining spoiled food (along with providing Harvest, "[t]o the extent assignable, all rights and remedies available to [Y&S] or its subcontractors" against the food seller), while the indemnity clause would require Harvest to hold Y&S harmless "from and against any and all claims or causes of action for injury to or death of" its employee.[30]

The indemnity clause may be given the construction Y&S advances without interfering with the plain-language operation of the warranty clause, because Harvest retains the classic warranty remedy of replacement. But to give the warranty clause the construction Harvest advances, one that creates liability for all damage flowing from any breach of the warranty, would interfere with the plain-language operation of the indemnity clause. The harmonization proposed by Y&S is thus superior, because it "give[s] effect to all [the MSA's] provisions and render[s] them consistent with one another." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

The second purported conflict Harvest cites is with Article 14.0 (Compliance With Laws), which provides:

> [Y&S] shall comply with, and shall require all others engaged by it to comply with, federal, state, and local laws, rules, and regulations pertaining to the Work. [Y&S] shall be *liable for payment of fines or penalties* levied against [Harvest] for [Y&S's] or its subcontractors' violation of such laws, rules, or regulations. [Y&S] further agrees to *INDEMNIFY*, DEFEND AND HOLD [HARVEST] HARMLESS from *loss or liability* (including legal fees and expenses) *arising from any claim or cause of action* to the extent related to [Y&S's] violation of these laws, rules or regulations. Notwithstanding any provision to the contrary, [Harvest] shall not be responsible for downtime or other charges incurred by [Y&S] due to such violations. [Y&S] agrees to

---

[30] R. Doc. No. 58-4, p. 7.

13

INDEMNIFY, DEFEND AND HOLD [HARVEST] HARMLESS against, payment of contributions, taxes, and penalties for unemployment insurance or compensation, pensions, annuities, benefits, or other amounts related to compensation of personnel engaged by [Y&S] or its subcontractors, including amounts [Harvest] must collect, deduct, and pay. To the extent required by law, rule or regulation [Y&S] shall comply, and require its subcontractors to comply, with the following: [list of federal laws and regulations].[31]

It is undisputed that Mr. Chu, who was captaining the Y&S vessel at the time of the allision, was not properly licensed by the Coast Guard. Harvest therefore claims that "by arguing that Y&S is released from liability for the allision and well damage by virtue of the 'Indemnification' provision, Y&S renders the foregoing 'Compliance With Laws' provision not only totally meaningless, but directly contradictory to the language in the Indemnification provision."[32] That is not the case, even assuming Article 14.0 requires Y&S to comply with all laws and not just those listed at the end of the provision.[33] If the Coast Guard had fined Harvest for anything relating to the accident (if, for example, there had been environmental damage from damage to the well jacket), the compliance-with-laws provision would have made Y&S "liable for payment of [the] fine[]." Similarly, had anyone sued Harvest for Y&S's violation of law (a co-owner of the well, a Harvest employee injured in the accident, or the like), Y&S would have been required to "INDEMNIFY, DEFEND

---

[31] R. Doc. No. 58-4, p. 9 (emphasis added).

[32] R. Doc. No. 58-2, p. 15.

[33] The list of federal laws and regulations does not include the Coast Guard regulation Mr. Chu violated. But considering that Article 14.0 opens by requiring compliance with "federal, state, and local laws" (although not with "*all* federal, state, and local laws," which would make the issue clearer) and the list of laws at the end includes no state laws except those relating to asbestos and no local laws at all, the fairest construction of this provision would seem to require treating the list of laws at the end as illustrative rather than restrictive.

AND HOLD [HARVEST] HARMLESS from loss or liability (including legal fees and expenses) arising from" that claim.

The structure of the contract and the phrasing of Article 14.0 indicate that it applies only to claims by third parties. First, it does not specifically mention claims by Harvest, while Article 10.0 does. Second, the phrase "loss or liability . . . arising from any claim or cause of action" means a loss or liability "arising from" a "claim." Harvest's loss does not "arise from" its "claim" against Y&S—it arises from damage to its well jacket. The phrase clearly contemplates a "claim" or "cause of action" by someone other than Harvest. It is thus possible to read the indemnity and compliance-with-laws provisions as consistent with each other, and with each having separate effect.

The same cannot be said of giving the first paragraph of the indemnity provision in Article 10.0 the construction that Harvest advances. Harvest asserts that the provision on which Y&S relies, the first paragraph in Article 10.0, "operate[s] only vis-a-vis [Y&S's] liability <u>to a third party</u>."[34] The parties negotiated a separate and distinct indemnity provision to cover their mutual risk of liability to a third party, however. The third paragraph of Article 10.0 states that "[e]ach party shall indemnify and defend the other against (I) fines or civil penalties and (II) costs (including legal fees and expenses) and liability arising from claims or suits *by third parties* based on death, personal injury, loss or damage to property or to the environment to the extent (I) or (II) are caused by its negligence."[35] And the third paragraph goes on to define "third party" as "any firm, person

---

[34] R. Doc. No. 58-2, p. 7 (underlining in original).

[35] R. Doc. No. 58-4 p. 8 (emphasis added). The kind of liability covered by the third paragraph, "fines or civil penalties" and "costs . . . and liability"

15

or other entity not a member of the [Harvest] Group or the [Y&S] Group."[36] But if the defend, indemnify, and hold harmless language of the first paragraph—the paragraph on which Y&S relies—applies only to third parties (as Harvest urges), the language in the third paragraph would contradict the language in the first paragraph. Under the first paragraph, Harvest's duty to indemnify, defend, and hold Y&S harmless applies "regardless of the cause or reason thereof, and regardless of the sole joint or concurrent negligence of the [Y&S] Group," but under the third paragraph, Y&S is required to indemnify and defend Harvest against "claims or suits" to the extent they are "caused by [Y&S's] negligence."[37]

Taken as whole, the structure of Article 10.0 is clear. The first paragraph requires Harvest to indemnify, defend, and hold Y&S harmless for damage to Harvest's property or

---

        "based on death, personal injury, loss or damage to property or to the environment," is broader than the kind of liability covered by the first paragraph, which applies only to damage to Harvest's property or equipment and injury or death to members of the Harvest Group.

[36]    R. Doc. No. 58-4, p. 8.

[37]    Harvest asserts that under the last-antecedent rule, qualifying words (such as "regardless of the cause or reason therefore, and regardless of the sole joint or concurrent negligence") refer only to the phrase immediately preceding the qualifier and not more remote phrases. R. Doc. No. 58-2, p. 15. Even if this were the case, it would not save the first and third paragraphs from contradicting one another on the duty to indemnify and defend against claims by third parties for injury or death. Harvest also gets the last-antecedent rule wrong. When, as in the first paragraph of Article 10.0, "there is a serial list followed by modifying language that is set off from the last item in the list by a comma, this suggests that the modification applies to the whole list and not only the last item." *Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp.,* 509 F.3d 216, 223 (5th Cir. 2007). Accordingly, the modifying language "regardless of the cause or reason therefore, and regardless of the sole joint or concurrent negligence" in the first paragraph applies to both claims for damage to the Harvest Group's property and claims for injury or death to members of the Harvest Group.

people, "regardless of the sole joint or concurrent negligence" of Y&S. The second paragraph requires Y&S to indemnify, defend, and hold Harvest harmless for damage to Y&S's property or people, "regardless of the sole joint or concurrent negligence" of Harvest. The third paragraph requires Y&S to indemnify and defend Harvest against claims by third parties that are based on Y&S's negligence, and requires Harvest to indemnify and defend Y&S against claims by third parties that are based on Harvest's negligence. The parties are responsible for their own negligence only when it affects third parties.[38]

This scheme is internally consistent. Adopting Harvest's interpretation of the first paragraph would upend this clear scheme by interpreting the first paragraph to apply only in circumstances where the third paragraph was plainly intended to apply, and this would create internal contradictions. Accordingly, Harvest's proposed interpretation fails the primary rule for construing contracts—that the contract must be viewed as a whole and effect given to each of its parts, according to each the sense that results from reading the entire agreement. *See Travelers Ins. Co. v. McDermott, Inc.*, 2003 WL 21999354, at *7 (E.D. La. Aug. 22, 2003).

## CONCLUSION

The MSA is clear. It requires Harvest "to defend, indemnify and hold [Y&S]

---

[38] Harvest's argument that the contract cannot provide for indemnity in the case of gross negligence has no merit. Louisiana law does not apply to this dispute, as it did in *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001), and the parties' specific exclusion of gross negligence in another part of Article 10.0 is sufficient evidence that they specifically intended to include gross negligence where they did not exclude it, assuming such a requirement exists in the General Maritime Law. In any event, it is quite doubtful whether the facts of this case would be sufficient to support a finding of gross negligence.

harmless from and against any and all claims or causes of action" for "loss of or damage to the respective property and equipment of [Harvest] Group." Harvest's claim against Y&S for damage to its well jacket is precisely such a claim. Accordingly, Y&S's motion for summary judgment on its counterclaim asking that Harvest be ordered to indemnify and hold Y&S harmless is **GRANTED**, and Harvest's opposing motion for summary judgment is **DENIED**.[39]

New Orleans, Louisiana, this 25th day of July, 2013.

*Susie Morgan*
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[39] Harvest's final argument, that Y&S waived the right to plead release because it failed to raise it as an affirmative defense in its answer, has no merit. Y&S does not ask for "release." It asks for indemnity and for Harvest to be ordered to defend and hold it harmless, and indemnity and defense need not be affirmatively pleaded under Federal Rule of Civil Procedure 8(c)(1). If this is a technical answer because the practical effect of granting indemnity will be to release Y&S, it is worth noting that Harvest's objection is a technical one. Y&S did plead all of the terms of the MSA in its answer.